77 So.2d 84 (1954)
LUMBERMEN'S MUTUAL INSURANCE CO.
v.
Calvin RUIZ.
No. 3914.
Court of Appeal of Louisiana, First Circuit.
December 10, 1954.
Dugas, Bean & Bertrand, Lafayette, for appellant.
Harry B. Garland, Felix A. DeJean, Jr., Opelousas, for appellee.
ELLIS, Judge.
On September 26, 1950 at approximately 4:30 P.M. two miles east of Opelousas in St. Landry Parish on U. S. Highway 190, the defendant had a flat on his Oldsmobile automobile, and left it parked on the highway. At about 7:00 P.M. the plaintiff's insured, Aldest Zeringue, was driving on said highway and ran into the rear of the defendant's parked car. The plaintiff, as the insurer of Zeringue, paid his $567.49 which represented the damage done to his car as a result of the collision, less $50 deductible as provided by the policy, and $36.50 for medical treatment, making a total of $603.99. Accordingly plaintiff has filed this suit to recover the amount so paid.
Plaintiff alleged that at the time of the settlement it secured from its insured a receipt and act of subrogation of all his rights with respect to the loss and damage arising out of the collision of September 26, 1950 "which said act of subrogation will be produced on trial hereof."
There was filed a prayer for oyer of the receipt and act of subrogation. In answer, the plaintiff filed a "subrogation receipt" dated October 31, 1952 and signed by Aldest Zeringue on the date. The accident having occurred on September 25, 1950, the suit *85 having been filed on the 24th of September, 1951, and the subrogation receipt filed in answer to the prayer for oyer being the date October 31, 1952, the defendant filed an exception of no right or cause of action which was referred to the merits by the district judge.
The defendant filed his answer which was a general denial of the allegations of plaintiff's petition and in the alternative a plea of contributory negligence.
The case was tried on its merits and plaintiff offered the original proof of loss which contained a settlement and subrogation agreement signed by its insured on October 16, 1950 before L. Austin Fontenot, Notary Public. To this offering counsel for defendant objected on the ground that it constituted an enlargement of the pleadings and further that plaintiff in answer to the prayer for oyer had filed a subrogation dated October 31, 1952 which was depended on in the preparation of the case.
At the completion of the testimony the district judge overruled the exceptions and rendered judgment in favor of the plaintiff as prayed for, from which the defendant has appealed.
The defendant is re-urging its exception of no right or cause of action on the ground that the subrogation agreement was dated after prescription was run and after the actual filing of the suit, and on the further ground that the subrogation was not taken at the time of payment.
Recently this Court in the case of John M. Walton, Inc., v. McManus, 67 So.2d 130, 132, had occasion to somewhat discuss the law with regard to subrogation in cases of this kind, and we stated:
"Although there is no act of subrogation to the insurance company in the record, we believe that the said company still might assert its rights under the laws of our state. The courts of this state have held that where an insurer has paid damages to an automobile as a result of a collision with vehicle of another, the right of subrogation to the extent of said payment exists by virtue of Article 2315 of the LSA-Civil Code, which gives a right of action to any one who is injured or damaged through the fault of another. In London, Guarantee & Accident Insurance Co. v. Vicksburg, S. & P. R. Co., 153 La. 287, 95 So. 771, 772, the Supreme Court, in discussing the contention as to whether an act of subrogation is necessary in such a situation said that the right of an insurer to sue in such a situation:
"`* * * arises from the general provisions of article 2315 of the Civil Code. The article gives a right of action for damages to any and every one who is injured by another's fault. If the loss of $515 which the surety company has sustained was caused by the fault or negligence of the railroad company, the latter is answerable directly to the surety company for the loss.'"
It was only necessary for plaintiff to allege and prove payment in accordance with its contract of insurance and this it clearly did.
Article 15 of plaintiff's petition is as follows: "That at the time of this settlement, petitioner secured from said Aldest Zeringue a receipt and act of subrogation against all persons whomsoever of all of his rights with respect to the loss and damage arising out of said collision on September 26, 1950, which said act of subrogation will be produced on trial hereof."
The proof of loss which also contained a stipulation of subrogation signed on October 16, 1950, which was introduced on the trial of the case, did not affect plaintiff's cause of action which under the law and the case cited arose at the time the plaintiff insurer paid its insured. It did not have to secure an act of subrogation in this case. The exception of no cause or right of action was properly overruled.

On the Merits
The proof reveals that on September 26, 1950 the defendant was returning *86 from his work and had as guest passengers three friends, Touchet, Chaisson, and Barrett, and when about two miles east of Opelousas on Highway 190, he had a flat tire on the left back wheel, at about 4:30 P.M. and left his car parked in the eastbound lane of traffic. About 7:00 P.M. the insured, Zeringue, was driving east on said highway toward his home and ran into the rear end of this parked automobile. He testified that there was considerable traffic approaching just prior to the accident, that he dimmed his lights and the first oncoming car finally responded but that some cars behind the first car did not dim their lights, and he was blinded and accordingly slowed down and applied his brakes, and it was then that he noticed the defendant's parked car on the road but that he was too close to avoid striking it.
It is shown that the road where the car was parked had practically no shoulders, and that due to the approaching cars Zeringue was unable to go around it. He testified that it was dark at the time and that the parked automobile of the defendant had no lights turned on nor any warning signal or flares of any kind. On cross-examination this witness testified that he was about 40 feet from the parked automobile when he first saw it and applied his brakes which caused his car to skid approximately 20 or 30 feet.
Zeringue testified that the cost of the repairs necessary to his automobile was $617.49, of which amount he paid the first $50 and the plaintiff insurer paid the remaining $567.49, and that as a result of the accident his hospital and clinic bill was $16.50 and the doctor bill was $20, all of which amount, except the $50 deductible was paid to him by the plaintiff insurer.
Trooper Howard Gilbeau testified that prior to the accident he had come upon the parked car of the defendant and had spoken to the latter with reference to it being parked on the highway, and told the defendant that it was a dangerous place to have the car parked. The defendant told him that he had sent someone to Port Barre to have the tire fixed and that they should be back soon. The trooper estimated the time when he first saw the parked automobile at between 4:30 P.M. and 5 P.M. He was patrolling this highway and it was on his way back that he came upon the accident. It is his testimony that the defendant's car was parked with all four wheels on the highway proper. He is not sure whether the defendant was there when he first arrived after the accident but is certain he was there before he left the scene of the accident. He testified that at that time the lights were turned on on the defendant's car but "I do not know if they were there when the accident happened." This trooper explained that when he first saw the car parked on the highway it was daylight and he at that time thought it enough hazard to stop and ask defendant to move it, and when the defendant told him he was moving it soon, as the man who went to have the tire fixed would be back in a few minutes, and as the defendant at that time was staying with the car, he left without staying himself and seeing that it was moved.
The plaintiff also produced the witness Wyble who was traveling on the highway that afternoon at about 5:30 P.M. and saw the defendant's car parked on the highway. At that time there was a good deal of traffic. He stated that there were no lights on the car because at that time there was no reason for lights, and there were no flares or warning lights or device.
Also testifying on behalf of the plaintiff was a witness Dupre, who saw defendant's parked automobile on the road at approximately 4:30 P.M. and who saw no lights or flares or warning devices of any kind, however, it was not dark at that time.
The defendant's testimony is not too satisfactory, however, in effect he testified that he had parked his automobile about 5:15 P.M. due to a flat tire. It appears from his testimony that one of the passengers in the car reached Port Barre someway and got in touch with one Barrett who came back and picked up the defendant and they went to Opelousas and had the tire fixed. The defendant testifies that this only took approximately 30 minutes. It was during *87 that period that the car was unattended that the accident occurred. It is rather difficult to find out just what happened to the three passengers, but it is rather immaterial in view of the fact that no one stayed with the car. After Barrett came by from Port Barre and picked up the tire and the defendant.
It is defendant's testimony that he left the lights burning on his car. He also testified that they put some kind of an extra tire on the car and that he drove it from where it was originally parked off on the shoulder, however, the testimony as to it being parked completely off the highway is in conflict with the preponderance of the evidence. If he could drive it at all he should have driven it to a point where it could have been parked completely off the highway. There is no doubt from the testimony that the car was parked on the highway.
According to the facts, the defendant's car was parked within two miles of Opelousas, which is much closer than Port Barre. He could more than likely have had the tire fixed in Opelousas and the car removed before dark. Exactly what he did from 4:30 P.M. until 7:00 P.M. is not clearly shown by the record.
Chaisson, one of the passengers in defendant's car, testified that the defendant was only a mile and a half out of Port Barre when he had the flat, which is in direct conflict with the proven facts, and that the State Trooper came there while they were parked and they asked him if the car was out of the way and he said "that was about as close as we could get to the ditch." The trooper to whom they were referring was Gilbeau, and his testimony is entirely different as to where the car was parked. Chaisson also testified that he told the defendant to turn the lights on and that he did and that they were still burning when they got back from Opelousas with the tire.
Touchet testified on behalf of the defendant that they had a flat tire and parked on the side of the road, and as the extra tire was flat he went on to Port Barre and got Lester Barrett to go back to where the car was parked in order to take defendant to Opelousas to have the tire fixed, and that he did not return with Barrett but went on home. This witness stated that the parked car was as far off the road as they could get it and that there was plently of room for two cars to pass, but when pressed he modified this somewhat when he stated that he could not say whether it was on the black top or off of it.
The District Court evidently found that the car was parked on the highway unattended and without lights so as to bring the case within the exception to the general rule so well established in our jurisprudence.
We find no manifest error in the judgment of the trial court and it is affirmed.